# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| COLUMBIA RIVERKEEPER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT PRUITT, et al.,<br><br>Defendants. | Case No. C17-289RSM<br><br>ORDER RE: MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on the Parties' Cross Motions for Summary Judgment. Dkts. #19 and #31. For the reasons stated below, the Court GRANTS IN PART Plaintiffs' Motion and DENIES Defendant's Motion.

## I.  BACKGROUND

**A. Salmon and Other At-risk Fish of the Columbia and Snake Rivers**

The Columbia River is the largest river in the Pacific Northwest, with the Snake River as its largest tributary. The Columbia flows more than 1,200 miles from its source in the Canadian Rockies to the Pacific Ocean. *See* Dkt. #1 at 9. The Snake River forms in Wyoming and flows over 1,000 miles across Southern Idaho, along the Idaho-Oregon border, and through Eastern Washington. Dkt. #1 at 9. The drainage basin of the Columbia and Snake Rivers extends into

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 1

seven U.S. states and up into Canada, encompassing an area roughly the size of France. *See* Dkt. #31 at 16-17.

Today, the Columbia and lower Snake Rivers are native habitat to multiple species of salmon and steelhead trout. Dkts. #1 at 9, #19 at 9-11, and #31 at 17. The Columbia River Basin once held the largest salmon populations in the world, with the Snake River historically sustaining at least a third of those salmon runs. *See* Dkt. #31 at 9. However, populations of these salmon and steelhead have since declined, with 13 species or populations in the Columbia and Snake River now being listed as "endangered" or "threatened" under the Endangered Species Act, and several populations having now gone extinct. Dkt. #19 at 11. Currently, 65 percent of remaining populations are listed at "high risk" of extinction, while only 6.5 percent are listed as "viable" or "highly viable." *Id.*

Salmon and steelhead native to the Columbia and Snake Rivers hatch in fresh water and migrate downstream to the Pacific Ocean as juveniles, returning as adults to the same river tributaries to spawn. Dkt. #1 at 9. These fish species are generally suited to cold-water, and depend on cold water temperatures for migration, spawning, and rearing. Dkt. #31 at 17. During their trips up and down the Columbia and Snake Rivers, these salmon and steelhead are particularly vulnerable to harm caused by warm water temperatures, specifically as the water reaches or exceeds 68° Fahrenheit ("F") for extended periods. Dkts. #19 at 6 and #31 at 18. When water temperatures approach 68° F, adult salmon have difficulty migrating upstream, and at 72-73° F, migration stops altogether. *Id*. Salmon that have stopped or slowed in their migration may end up staying in the warm water, where they are at risk of death, disease, decreased spawning productivity, and delayed spawning. Dkt. #27-14 at 23-25.

The parties agree that much of the focus for potential causes of increases in water temperature in both the Columbia and Snake Rivers appropriately lies on the presence of dams and point source dischargers located on both rivers. *See* Dkt. #31 at 17. There are a number of federal and non-federal dams on both rivers, with the federal dams operating for a variety of purposes, including hydroelectric power, flood risk management, navigation, and fish and wildlife conservation. *Id*. In addition, as of 2003, there were around 100 point source dischargers on the two rivers. *Id*.

In recent years, water temperature in the Columbia and Snake Rivers has consistently exceeded 68° F, especially during the summertime salmon and steelhead runs, presenting a problem for the continued survival of those native fish populations. Dkts. #1 at 10 and #19 at 7 and 9-10. Temperature issues are projected to worsen as the effects of human activities and climate change continue to increase water temperatures, negatively impacting the ability of salmon and steelhead to successfully migrate to and from the Pacific Ocean to spawn. *Id*. The presence of these high water temperatures led the states of Washington and Oregon to place and maintain both rivers on their respective Clean Water Act ("CWA") § 303(d) lists of impaired waters. Dkt. #27-22 at 10 and 24.

**B. Washington and Oregon States' 303(d) Programs**

The State of Washington prepared its first 303(d) list in 1994, placing segments of the Columbia and lower Snake Rivers on that list in 1998. *See* Dkt. #31 at 14-15. Presently, 40 of 77 segments of the Columbia River and 9 of 19 segments of the Snake River are listed as having an impaired water temperature under Washington's current water temperature standards. *Id*. at 15. The current Washington water temperature standards require that temperatures must stay below 60.8-68° F depending upon the time of year, location, and fish present. *Id*.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 3

The State of Oregon first listed segments of the Columbia and lower Snake Rivers on its own 303(d) list in 1996. *Id*. at 16. At present, the entire length of the Columbia River in Oregon is listed as impaired by temperature. *Id*. Oregon's current water temperature standards range from 55.4° F for some fish spawning areas from the months of October to April, to 68° F year-round. *Id*.

Both Washington and Oregon's water temperature standards include "natural conditions criteria" for temperature, which provide that "if the natural temperatures in the water body exceed the numeric biologically-based criteria, then the natural temperatures constitute the applicable temperature criteria for that water body." *Id*. at 15-16. While the Environmental Protection Agency ("EPA") approved both states' natural condition criteria in the past, that EPA approval was overruled in part after litigation in Oregon, and is currently involved in pending litigation in Washington. *Id*.

**C. The 2000 Memorandum of Agreement and State-EPA Agreements on TMDL Responsibilities**

After both Washington and Oregon listed the Columbia and Snake Rivers on their respective 303(d) lists, the EPA, Washington, Oregon, and Idaho signed a Memorandum of Agreement ("MOA"). Dkt. #27-15. The MOA was signed on October 16, 2000, and outlined a cooperative multi-state and federal approach to address temperature related impairments in the two rivers. *Id*.

The main focus of the MOA was to "document a mutual understanding on the approach and roles among Idaho [Department of Environmental Quality], Washington [Department of Ecology], Oregon [Department of Environmental Quality], EPA Region X, and the Columbia Basin Tribes to complete a total dissolved gas and temperature Total Maximum Daily Load

(TMDL) for the mainstem[1] Columbia and Snake Rivers." *Id.* at 5. Further describing the approach to be taken, the MOA outlines that the EPA "will produce," a TMDL for temperature for the Snake/Columbia Mainstem in cooperation with the States. *Id*. at 8. Each state, under the MOA, is required to produce the TMDL for total dissolved gas ("TDG") in cooperation with the dam operators for their water-ways within their boundaries. *Id*. Additionally, each state is designated to assist the EPA with the production of "significant portions" of the implementation plans for the temperature TMDL, particularly with regards to those sections related to non-point sources. *Id*. at 9.

On April 16, 2001, the EPA prepared a Work Plan designed to outline the key dates associated with drafting and finalizing the TMDL in accordance with the MOA, as well as the roles of the EPA and the States in that process. Dkt. #27-17. In the Work Plan, the EPA outlined that the EPA would take the lead for developing the temperature TMDL, and the States would be responsible for issuing that TMDL. *Id*. at 5. The States, on the other hand, would be solely responsible for taking the lead in developing and issuing the TDG TMDL for their waters. *Id*.

Further, while the EPA "oversees the entire 303(d)/TMDL process with responsibility for approving or disapproving state issued 303(d) lists and TMDLs," under the Work Plan "[i]f EPA disapproves a State TMDL, EPA is required to develop a TMDL to replace the disapproved one." *Id*. The Work Plan set the date for the submission of the draft TMDL at February 1, 2002, and the release of the final TMDL in July or August of 2002. *Id*. at 3.

---

[1] Mainstem is defined in common-usage as a "main channel," such as, the "main course of a river or stream." *See Definition of Main Stem*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/main%20stem (last visited October 16, 2018).

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 5

**D. The 2003 Draft Temperature TMDL and Current Developments**

On September 4, 2001, Washington State, through its Department of Ecology, wrote to EPA Region X seeking clarification on which agencies would lead, develop, and produce the temperature and TDG TMDLs. Dkt. #27-18 at 2. In that letter Washington sought to clarify its expectations that the EPA would lead the development of, and issue the TMDLs for Washington, so that Washington state could then implement those EPA-issued TMDLs. *Id*. Oregon State submitted its own letter to the EPA on October 4, 2001, echoing the Washington State letter and requesting that the EPA issue the TMDL, so that the state could then implement that EPA-issued TMDL in Oregon. Dkt. #27-20 at 2-3.

In a January 15, 2002, letter written to the Columbia River Inter-Tribal Fish Commission, the EPA responded to a request regarding the status of the TMDLs, indicating that its role in that process was to conduct technical analysis, issue a federal TMDL, and approve or disapprove the TDG TMDLs submitted by Oregon and Washington. Dkt. #27-21 at 2. The EPA letter specially addressed the requests of the two states in defining its actions, stating: "at the request of the states of Oregon and Washington, EPA will be doing the technical analysis and issuing temperature TMDLs for the Columbia/Snake River Mainstem in Oregon and Washington." *Id*.

Just under one month later, on February 12, 2003, Washington and Oregon wrote a joint letter to the Council on Environmental Quality, a federal executive administrative agency, expressing the understanding of both States that they would be taking the lead on the TDG TMDL, while the EPA would be taking the lead on the temperature TMDL. Dkt. #27-23 at 2. In a March 18, 2003, document entitled "EPA Strategy for Consultation and Coordination with Indian Tribal Government for Completing Mainstem Columbia River and Snake River

TMDLs," the EPA included a section noting that it was currently working in coordination with the states of Oregon and Washington to develop TDG and temperature TMDLs in the Columbia and Snake Rivers. Dkt. #27-24 at 2. The document specifically states, "at the request of the states of Oregon and Washington, EPA will be doing the technical analysis and issuing temperature TMDLs for the Columbia/Snake River Mainstem in Oregon and Washington." *Id*.

Finally, in July 2003, the EPA released a "Preliminary Draft" of the temperature TMDL for the Columbia and Snake Rivers. Dkt. #27-22. In the draft, the EPA noted that while the responsibility for development of TMDLs generally falls to the States, because of the interstate and international nature of the waters, its relationship with tribal-trust duties, and the technical expertise required, the EPA had agreed to take responsibility in this case. *Id*. at 7. Outlining further steps in the plan toward issuing the final TMDL, the draft states that after being released it would undergo a 90 day public comment period, where, after consideration of public comments and appropriate changes, the EPA would issue the final temperature TMDL for the Columbia and Snake River Mainstem. *Id*.

Since July 2003, the EPA has not issued a final temperature TMDL, indicating in an internal EPA document that the EPA worked "extensively on a draft TMDL until late 2003," with that work then suspended due to disagreements between federal agencies at the national level. Dkt. #27-25 at 2. In a February 20, 2007, letter from the EPA to the U.S. Army Core of Engineers, the EPA acknowledged that it remained responsible for development of the temperature TMDL for the mainstem Columbia and Snake Rivers. Dkt. #27-26 at 2.

Since 2003, the native salmon and steelhead populations of the Columbia and Snake Rivers have continued to be affected by warm water temperatures. In 2015, warm water temperatures in the Columbia and Snake Rivers were responsible for the deaths of roughly

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 7

250,000 migrating adult sockeye salmon. Dkt. #12 at 2. Of those migrating salmon, upper Columbia River sockeye had the lowest survival rate in the past six years, and endangered Snake River sockeye had a survival rate of only four percent, down from the 44-77 percent survival rates of the past five years. Dkt. #27-9 at 4. Native steelhead populations have been similarly affected, with predictions on the 2017 run indicating that it had "collapsed," and with the Idaho Department of Fish and Game for the first time prohibiting anglers from taking Snake River steelhead. Dkts. #22 at 5 and #25 at 5.

After the instant litigation had begun, the EPA sent a letter to the states of Oregon, Washington, and Idaho, dated August 10, 2017, requesting a modification of the MOA, so that direct work on the final TMDL could be resumed. Dkt. #18-1 at 2. In its letter, the EPA states that changed circumstances involving technology, natural conditions, and legal challenges to previous EPA and state standards necessitate a modification to the MOA prior to the EPAs ability to issue any final temperature TMDL. *Id*. at 2-7.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Clean Water Act

The Court will address Plaintiffs' Motion for Summary Judgment first. Plaintiffs argue that the EPA has violated the CWA, 33 U.S.C. § 1313(d)(2), by failing to issue a TMDL for the Columbia and lower Snake Rivers. Plaintiffs contend that Washington and Oregon have made a "constructive submission" to the EPA under the CWA by clearly and unambiguously indicating that they will not produce a TMDL. Dkt. #19 at 11 (citing *Sierra Club v. McLerran*, No. 11-cv-1759-BJR, 2015 WL 1188522 at *7 (W.D. Wash. Mar. 16, 2015). Evidence of this can be found in the 2000 MOA, which provided that "EPA will produce" the temperature TMDL, *see* Dkt. #27-15 at 7, and subsequent letters to the EPA in the fall of 2001 where Washington and Oregon requested the EPA to issue the TMDL, *see* Dkts. #27-18 and #27-20. Once a constructive submission occurs, the EPA has a mandatory duty under the CWA to disapprove the constructively submitted TMDL within 30 days and to issue a TMDL within 30 more days; if the EPA fails to take these steps, the courts can order the EPA to prepare a TMDL under the CWA. *Id.*; *Alaska Ctr. for Env't v. Reilly*, 762 F. Supp. 1422, 1429 (W.D. Wash. 1991) ("*ACE I*"). Plaintiffs assert that the 2000 MOA and the other correspondence above serve as evidence

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 9

of this constructive submission, and that the EPA has therefore violated the CWA by failing to issue a timely TMDL.

The EPA argues that the constructive submission theory does not apply here. Dkt. #31 at 25.[2] The agency argues that this judicial theory has been adopted by the Ninth Circuit "only with respect to wholesale programmatic failures by a state to submit any TMDLs." *Id*. (citing *Baykeeper v. Whitman*, 297 F.3d 877, 882 (9th Cir. 2002)). The EPA also cites to *Friends of the Wild Swan, Inc. v. EPA*, 130 F. Supp. 2d 1184, 1190-91 (D. Mont. 1999), *Idaho Sportsmen's Coal. v. Browner*, 951 F. Supp. 962, 967-968 (W.D. Wash. 1996), and several out of circuit cases. *Id*. at 29–30. The EPA argues that finding a constructive submission of a single, particular TMDL "would run counter to the intent of Congress – which allowed states to set priorities – and to the implicit limitations recognized by courts in adopting and applying the theory over the last three decades." *Id*. at 31. The EPA points out that Washington and Oregon have been busy issuing 2,800 other TMDLs during this time period. *Id.* at 32. The EPA further argues that Plaintiffs are citing dicta in *Sierra Club v. McLerran*. *Id*. at 32–33. Citing *Alaska Center for Environment v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994), the EPA states:

> The Ninth Circuit has, therefore, already weighed the question at bar here: whether the constructive submission theory allows individual plaintiffs or interest groups to pick and choose particular TMDLs that they determine are of the highest priority, notwithstanding express statutory language giving state officials the authority to set that prioritization to best advance the interests of all their citizens. The Ninth Circuit concluded that it does not. Because the *McLerran* dicta is at odds with the Ninth Circuit's conclusion that compelling particular TMDLs impermissibly interferes with state prioritization, it must be rejected.

---

[2] The EPA also argues that the constructive submission theory is a legal fiction, an exercise in judicial lawmaking, contrary to the intent of Congress, and unlawful except as applied in *Baykeeper, infra*. The Court acknowledges these arguments, but will rely on Ninth Circuit precedent permitting the application of this theory. *See City of Arcadia v. U.S. EPA*, 411 F.3d 1103 (9th Cir. 2005); *Sierra Club*, 2015 WL 1188522 at *6.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 10

*Id.* at 35. The EPA argues that "Plaintiffs have failed to identify a single court that has found a constructive submission triggering EPA's obligations under Section 303(d)(2) as to a particular TMDL." *Id.* at 36. The EPA goes on, "[t]he theory, to the extent it is lawful, is an extraordinary and extra-statutory gloss reserved for only the most egregious instances of state refusal to participate in the Clean Water Act's statutory scheme." *Id*. The EPA also argues that, even if the Court were to apply the constructive submission theory to this case, Plaintiffs' claims fail as a factual matter because "the state's actions [do not] clearly and unambiguously express a decision not to submit TMDLs." *Id*. at 36 (quoting *Baykeeper*, 297 F.3d at 882). The EPA goes through the documents and communications cited by Plaintiffs and detailed above. *Id*. at 36–46. Finally, the EPA argues that "should this Court find merit in Plaintiffs' non-discretionary duty claim, the relief afforded must be limited to an order to approve or disapprove the constructive submissions and may not extend to an order to issue the TMDL." *Id*. at 50. As stated previously, the EPA has a duty under the CWA to disapprove the constructively submitted TMDL within 30 days and to issue a TMDL within 30 more days, only if those deadlines are missed can the Court order the EPA to issue the TMDL

Plaintiffs retort that "every court that has specifically considered this issue has concluded that the [constructive submission] doctrine applies to individual TMDLs." Dkt. #33 at 7. Plaintiffs rely on *Scott v. City of Hammond*, 741 F.2d 992 (7th Cir. 1984); *City of Arcadia, supra*; *Hayes v. Whitman*, 264 F.3d 1017, 1023 (10th Cir. 2001); *Sierra Club*, *supra*; *Ohio Valley Envt'l. Coal. v. McCarthy*, No. 3:15-0271, 2017 WL 600102, *9–*10 (S.D. W.Va. Feb. 14, 2017) (*OVEC I*); *Ohio Valley Envt'l. Coal. v. Pruitt*, No. 3:15-0271, 2017 WL 1712527 (S.D. W.Va. May 2, 2017) (*OVEC II*); and *Las Virgenes Municipal Water District v. McCarthy*, C 14-01392 SBA, 2016 WL 393166 (N.D. Cal. Feb. 1, 2016). Plaintiffs say that, despite

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 11

"Washington's and Oregon's otherwise-robust TMDL programs," "the temperature TMDL is not on, and has not been on, Washington's or Oregon's mandatory TMDL development schedules" for a reason—the States asked the EPA to prepare and issue the TMDL previously. *Id*. at 14. Plaintiffs argue that the 19-year delay since Washington and Oregon placed temperature-impaired segments of the Columbia and lower Snake Rivers on their CWA 303(d) "impaired waters" lists is itself sufficient evidence of a "prolonged failure" amounting to constructive submission. *Id*. at 15 (citing *City of Arcadia*, 411 F.3d at 1105–06; *ACE I*, 762 F. Supp. at 1429).

The EPA also filed a Reply brief in support of their cross-motion, largely repeating previous arguments. Dkt. #35. The EPA contends that the Ninth Circuit's view on the constructive submission theory is "apparent" and that it "does not allow a plaintiff to compel issuance of a specific TMDL where a state is otherwise engaged in TMDL development and complying with Congress' command that it issue TMDLs 'from time to time.'" Id. at 3–4. The EPA requests supplemental briefing in a footnote. *Id*. at 12 n.4.

Plaintiffs filed a surreply moving to strike the EPA's request for additional briefing. Dkt. #38. The Court agrees that, procedurally speaking, the EPA's request is improperly contained in a reply brief and contrary to the joint litigation schedule. Accordingly, the Court will not consider this request.

The CWA and Ninth Circuit law provide for the constructive submission doctrine to apply when a state completely fails to issue TMDLs. *See Baykeeper, supra*. However, the Court is convinced that the EPA is misconstruing *Baykeeper* by arguing that a "complete failure by [the states] to submit TMDLs" is required. *See Baykeeper*, 297 F.3d at 881–882. The following dicta in *Sierra Club v. McLerran* provides the correct analysis of the instant situation:

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 12

Defendants assert that a constructive submission occurs only when a state produces few or no TMDLs for the whole state over a substantial period of time: If a state has a robust TMDL program, its decision to abandon a particular TMDL does not trigger the EPA's non-discretionary duty. Doc. No. 91 at 27. The Court questions this narrow interpretation of the doctrine for the reasons set forth below.

In making this argument, Defendants rely on *BayKeeper*'s holding and language, which focused on the state-wide TMDL program. This reliance is misplaced. The issue in *BayKeeper* was whether California's failure to produce a significant number of TMDLs constituted a programmatic failure for the entire state. *Id*. at 880–82. Clearly, California's producing several TMDLs and committing to more demonstrates that California had not abandoned its TMDL program. *See id*. However, the question here is whether Washington has abandoned a specific component of its CWA obligations—a question that was not before the *BayKeeper* court and one not resolved by looking to a state's general compliance. Accordingly, the Court finds it insignificant that the Ninth Circuit did not address an issue not raised by the facts of the case. Moreover, far from foreclosing the application of the constructive submission doctrine to a particular pollutant or waterbody segment, the *BayKeeper* court cited with approval to *Scott*, which applied the constructive submission doctrine to TMDLs for a particular waterbody segment, Lake Michigan. *See BayKeeper*, 297 F.3d at 882 (characterizing ruling as "consistent" with *Scott*).

….

Applying the constructive submission doctrine to individual TMDLs does not invade state prioritization. A constructive submission occurs only when a state has clearly and unambiguously abandoned its obligation to produce a TMDL or TMDLs. *See, e.g., San Francisco BayKeeper*, 297 F.3d at 883; *see also Alaska Ctr. for the Env't*, 762 F.Supp. at 1427(constructive submission when Alaska clearly and unambiguously abandoned its TMDL obligation). It does not occur merely because a state has prioritized one TMDL over another. *See Hayes*, 264 F.3d at 1024.

….

More importantly, while a state's failure to produce any TMDLs is perhaps the clearest indication that it has abandoned its statutory obligations, the Court finds nothing in the text of the CWA or its

> purpose to support Defendants' contention that a state's abandonment of a specific statutory obligation should be treated differently from a state's wholesale failure. To the contrary, a state's discretion to prioritize TMDLs over other TMDLs does not remove its ultimate obligation to produce a TMDL for each water pollutant of concern in every 303(d) water segment. *See* 33 U.S.C. § 1313(d)(2). In light of this statutory obligation, it would be absurd for the Court to hold that a state could perpetually avoid this requirement under the guise of prioritization; such an administrative purgatory clearly contravenes the goal and purpose of the CWA. 33 U.S.C.A. § 1251(a)(1) ("it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985").

*Sierra Club v. McLerran*, 2015 WL 1188522 at 6–7. The Court adopts this analysis and finds that the constructive submission doctrine does apply when a state abandons an individual TMDL.

Turning to the particular facts of this case, the Court agrees with Plaintiffs that the EPA has violated the CWA by failing to issue a TMDL for the Columbia and lower Snake Rivers. Considering the 2000 MOA and all the subsequent communications between the states and the EPA, cited above, the Court concludes that Washington and Oregon have clearly and unambiguously indicated that they will not produce a TMDL for these waterways. Whether rightly or wrongly, they placed the ball in the EPA's court, and the subsequent 17-year delay is strong evidence that the states have abandoned any initial step the EPA could possibly be awaiting. Recent communication between the EPA and the states indicates a desire to further delay this process. The Court agrees with Plaintiffs that there are key factual differences between this case and *Sierra Club v. McLerran*, including an insufficient basis for the states and the EPA to pivot away from issuing a temperature TMDL in 2003 and the sheer number of years that have elapsed in this case. *See* Dkt. #33 at 16–20. Accordingly, a constructive submission of "no TMDL" has occurred, but the EPA has failed to undertake its mandatory duty

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 14

to issue a temperature TMDL under the CWA. *See* 33 U.S.C. § 1313(d)(2). The Court will grant summary judgment on Plaintiffs' first claim.

### C. Unreasonable Delay under the APA

Plaintiffs next contend that the EPA has violated the Administrative Procedure Act ("APA") by failing to act for over 17 years. Dkt. #19 at 14–20. The Court need not address this claim, having found that the EPA has violated the CWA.

### D. Defendant EPA's Cross-Motion for Summary Judgment

Having reached the rulings above, the Court finds it can deny EPA's Motion at this time.

### E. Requested Relief

Plaintiffs request that the Court order the EPA to issue a temperature TMDL by a date certain, preferably within one year of this Order. Dkt. #19 at 20 (citing to 33 U.S.C. § 1365(a)(2); 5 U.S.C. § 706(1)). The Court agrees with the EPA that Plaintiffs are limited to the remedy provided under the applicable and specific waiver of sovereign immunity, and that the Court can only order the EPA to perform "any act or duty . . . which is not discretionary with the Administrator." Dkt. #31 at 47 (citing 33 U.S.C. § 1365(a)(2)). The Court thus agrees with the EPA's requested relief, and the applicable law; the EPA thus has 30 days from the date of this Order to approve or disapprove the constructively submitted TMDL, and, if disapproved, 30 days after the disapproval to issue a new TMDL. *See* 33 U.S.C. § 1313(d)(2). The Court does not see how the EPA can approve the constructively submitted TMDL consistent with its obligations under the CWA. Plaintiffs warn the Court that "based on EPA's track record and its August 2017 letter inviting further delay, it is unlikely EPA would take such prompt action and would instead try to further delay critical work on temperature in the Columbia and Snake

Rivers." Dkt. #33 at 37.  The Court believes that the parties can and should work together to resolve this issue and avoid further Court action.

### III. CONCLUSION

Having reviewed the relevant briefing and the remainder of the record, the Court hereby finds and ORDERS that:

1) Plaintiffs' Motion for Summary Judgment, Dkt. #19, is GRANTED IN PART. The EPA has 30 days from the date of this Order to approve or disapprove the constructively submitted TMDL at issue in this case, and 30 days after a disapproval to issue a new TMDL.

2) Defendant EPA's Motion for Summary Judgment, Dkt. #31, is DENIED.

DATED this 17 day of October, 2018.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE