**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COLUMBIA RIVERKEEPER; IDAHO RIVERS UNITED; SNAKE RIVER WATERKEEPER, INC.; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; THE INSTITUTE FOR FISHERIES RESOURCES,<br>                  *Plaintiffs-Appellees*,<br><br>v.<br><br>ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. ENVIRONMENTAL PROTECTION AGENCY,<br>                  *Defendants-Appellants*. | No. 18-35982<br><br>D.C. No. 2:17-cv-00289-RSM<br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted August 26, 2019
Seattle, Washington

Filed December 20, 2019

Before: Michael Daly Hawkins, M. Margaret McKeown,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Clean Water Act

The panel affirmed the district court's judgment in favor of environmental groups in a citizen suit under the Clean Water Act ("CWA") brought by environmental groups to compel the Environmental Protection Agency to develop and issue a long-overdue temperature "total maximum daily loads" ("TMDL") for the Columbia and Snake Rivers.

The plaintiff groups claimed that inaction by Washington and Oregon amounted to a constructive submission of no temperature TMDL, thus triggering the EPA's nondiscretionary duty to approve or disapprove the TMDL.

The panel held that a constructive submission will be found where a state has failed over a long period of time to submit a TMDL, and clearly and unambiguously decided not to submit any TMDL. The panel further held that where a state has failed to develop and issue a particular TMDL for a prolonged period of time, and has failed to develop a schedule and credible plan for producing that TMDL, it has no longer simply failed to prioritize this obligation. Instead, there has been a constructive submission of no TMDL, which triggers the EPA's mandatory duty to act.

Applying this standard, and viewing the facts in their totality, the panel agreed with the district court that "Washington and Oregon have clearly and unambiguously

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

indicated that they will not produce a TMDL for these waterways," and that as a result, "the EPA has violated the CWA by failing to issue a TMDL for the Columbia and lower Snake Rivers." *Columbia Riverkeepers v. Pruitt*, 337 F. Supp. 3d 989, 998 (W.D. Wash. 2018). The panel held that the constructive submission of no TMDL triggered the EPA's duty to develop and issue its own TMDL within 30 days, which it failed to do, and the EPA must do so now.

## COUNSEL

Jonathan Brightbill (argued) and Eric Grant, Deputy Assistant Attorneys General; Jeffrey Bossert Clark, Assistant Attorney General; Chloe H. Kolman and David Gunter, Trial Attorneys; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Bryan Hurlbutt (argued) and Laurence ("Laird") J. Lucas, Advocates for the West, Boise, Idaho, for Plaintiffs-Appellees.

## OPINION

McKEOWN, Circuit Judge:

The Columbia and Snake Rivers in Washington and Oregon are home to multiple species of salmon and steelhead trout. These fish are particularly vulnerable to warm water temperatures. This dispute arose when Columbia Riverkeeper and other environmental organizations filed a citizen suit under the Clean Water Act ("CWA") to compel the Environmental Protection Agency

("EPA") to develop and issue a long-overdue temperature "total maximum daily loads" ("TMDL") for the Columbia and Snake Rivers. Columbia Riverkeeper argues that Washington and Oregon's failure to issue this TMDL amounts to a "constructive submission" of no TMDL under the CWA, which triggers mandatory statutory obligations for the EPA. In response, the EPA argues that the constructive submission doctrine does not apply to individual TMDLs, but only to state TMDL regimes as a whole. We take this opportunity to clarify that the constructive submission doctrine applies to this temperature TMDL.

## BACKGROUND

### I. Statutory Background

Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To reduce the discharge of pollutants into navigable waters, the CWA first regulates point-source pollution directly with technology-based permitting requirements. *Id.* §§ 1311(a), 1362(12). When these controls fail to adequately improve polluted waters, the CWA uses a holistic, water-quality based approach. *See id.* § 1313. Under § 1313, states must identify qualifying "water quality limited segments" ("impaired waters") within their borders and rank them in order of priority. A water may be impaired because of a high level of a specific pollutant such as nitrogen, or a condition such as temperature or turbidity. These rankings are referred to as "§ 303(d) lists." Once a state has submitted a § 303(d) list, it must then submit a TMDL to the EPA for approval for each pollutant in each impaired water segment. This TMDL sets the maximum amount of a pollutant that each segment

can receive without exceeding the applicable water quality standard. *Id.* §§ 1313(d)(1)(A), (C).

States are required to send the EPA their initial priority ranking of impaired waters and completed TMDLs within 180 days of the agency's identification of covered pollutants. *Id.* § 1313(d)(2). The EPA published its list of covered pollutants in December of 1978, so the original priority rankings and TMDLs were due in June of 1979. The CWA requires states to update their priority rankings and submit remaining TMDLs "from time to time." *Id.* The EPA "shall either approve or disapprove" a TMDL within thirty days of its submission. *Id.* If approved, the TMDL goes into effect. *Id.* If the EPA disapproves, the agency "shall" produce and issue its own TMDL within thirty days. *Id.* These duties under the CWA are not discretionary. To this end, the CWA authorizes citizen suits in federal court against the EPA if it fails to perform any nondiscretionary duty imposed under the statute. *Id.* § 1365(a).

## II. Significance of Temperature in the Columbia and Snake Rivers

The Columbia and Snake Rivers are home to multiple native species of salmon and steelhead trout, but several species have gone extinct, and 65 percent of remaining populations face a high risk of extinction. These species are suited to cold water, and they depend on cold water temperatures for migration and spawning on the Columbia and Snake Rivers.

Water exceeding 68º F is particularly dangerous for salmon and trout. Above this temperature, they have difficulty migrating upstream, and they instead remain downstream where they are more likely to die of disease and spawn with far less frequency. The parties agree that dams

and more than 100 point-source discharges into the two rivers are a primary cause of rising water temperatures, which in recent years have consistently exceeded 68º for much of the summertime salmon and steelhead runs. Temperatures are projected to rise with increased human activity on the rivers, further endangering salmon and trout populations. This situation led Washington and Oregon to include both rivers on their lists of § 303(d) impaired waters.

### III. Washington and Oregon's TMDL Programs

Like many states, Washington and Oregon did not immediately satisfy their obligations under the CWA, missing—by years—the June 1979 deadline for initial submissions. In the mid-1990s, both states sent priority rankings to the EPA, noting that numerous segments of the Columbia and Snake Rivers failed to meet temperature quality standards, thus threatening the once-robust salmon and trout populations.

When Washington and Oregon first submitted their § 303(d) lists in the mid-1990s, neither state had developed a functioning TMDL program, and so in 2000 they entered into a Memorandum of Agreement ("MOA") with the EPA. Under the MOA, the EPA would "produce" a temperature TMDL for both the Columbia and Snake Rivers, and the states would have responsibility for issuing that TMDL. The states would then assist the EPA in "significant portions" of implementing the temperature TMDL. In light of the states' inadequate resources and relative lack of expertise, the states and the EPA agreed that the states would retain primary responsibility for producing and issuing the total dissolved gas TMDL that was also incomplete, while the EPA would develop the temperature TMDL in place of the states.

In April of 2001 the EPA prepared a Work Plan to further clarify responsibilities under the MOA, and to set key dates that it planned to meet. The EPA stated that it would develop the temperature TMDL, which the states would then issue. The states would retain sole responsibility for developing and issuing the gas TMDL. With these responsibilities clearly outlined, the EPA set February 1, 2002 as the date it would submit a draft temperature TMDL, with the expectation that a final TMDL would be released in July or August of 2002.

In September and October of 2001, respectively, Washington and Oregon each sent letters to the EPA requesting that the EPA not only develop the temperature TMDL, but also issue it. Both states acknowledged that they would then implement the EPA-produced TMDL. Washington's letter stated that it "would like to clarify that our expectation and desire is that EPA both lead the development of and *issue* the TMDLs for temperature in Washington." (emphasis in original). In a letter to the Columbia River Inter-Tribal Fish Commission in January of 2002, the EPA, consistent with Washington's and Oregon's letters, stated that "at the request of the states of Oregon and Washington, EPA will be doing the technical analysis and issuing temperature TMDLs for the Columbia/Snake River Mainstem in Oregon and Washington."

In accordance with the MOA and Work Plan, the EPA published a draft temperature TMDL for the Columbia and Snake Rivers in July of 2003, which specified that a final TMDL would be forthcoming after a 90-day public comment period. Due to opposition from other federal agencies, however, the EPA did not take any further steps to develop or issue a final temperature TMDL. Since 2003, no progress has been made on the development of the temperature

TMDL by the EPA or either state, although as late as 2007, the EPA continued to acknowledge that it was responsible for the development of the temperature TMDL in a letter to the U.S. Army Corps of Engineers.

Despite the lack of progress on the temperature TMDL, Washington and Oregon each developed robust TMDL programs. Each state produced and submitted for EPA approval more than 1,200 TMDLs for other pollutants and other bodies of water. However, neither state took further steps to develop or issue the temperature TMDL for the Columbia and Snake Rivers. And while both states have maintained priority rankings with target dates of completion for remaining TMDLs, neither list includes the required temperature TMDL.

## IV. District Court Proceedings

In February of 2017, Columbia Riverkeeper, Idaho Rivers United, Snake River Waterkeeper, Inc., Pacific Coast Federation of Fishermen's Associations, and the Institute for Fisheries Resources (collectively, "Columbia Riverkeeper") sued the EPA under the CWA's citizen-suit provision, claiming that inaction by Washington and Oregon amounted to a constructive submission of no temperature TMDL, thus triggering the EPA's nondiscretionary duty to approve or disapprove the TMDL. The district court granted Columbia Riverkeeper's motion for summary judgment[1] and ordered the EPA to approve or disapprove the constructive submission within thirty days, and upon disapproval, to issue

---

[1] The district court declined to rule on Columbia Riverkeeper's claim that the EPA's conduct amounted to unreasonable delay under the Administrative Procedure Act ("APA"). Because we affirm summary judgment under the CWA, we likewise do not address this additional claim.

a final TMDL within thirty days. The EPA disapproved the submission, filed this appeal, and sought a stay of the order requiring prompt issuance of the TMDL. The district court granted the stay pending appeal. After litigation began, the EPA revived development of the temperature TMDL and contacted the states, but the EPA has not developed or issued the temperature TMDL for the two rivers.

## ANALYSIS

### I. Constructive Submission Under the Clean Water Act

Section 1313(d)(2) of the CWA outlines the nondiscretionary statutory duties at issue in this case:

> Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established . . . . The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan . . . . If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards

>   applicable to such waters and . . . shall incorporate them into its current plan . . . .

There is no dispute that under this scheme, a state has a nondiscretionary duty to submit to the EPA a TMDL for each of the waters identified on its § 303(d) list. Nor is it disputed that the EPA has a nondiscretionary duty to approve or disapprove this submission within 30 days. If the EPA disapproves the submission, it must develop and issue its own TMDL for the impaired water within 30 days. On its face, however, § 1313(d)(2) is silent as to what duties the EPA has when a state simply fails to submit a TMDL altogether.

In *San Francisco BayKeeper v. Whitman* ("*BayKeeper*"), we adopted the constructive submission doctrine to fill this statutory gap. 297 F.3d 877 (9th Cir. 2002). In *Baykeeper*, we acknowledged that where a state has "clearly and unambiguously" decided that it will not submit TMDLs for the entire state, that decision will be "construed as a constructive submission of no TMDLs, which in turn triggers the EPA's nondiscretionary duty to act." *Id.* at 883, 880. We reaffirmed this principle in *City of Arcadia v. U.S. Environmental Protection Agency*, holding that "[t]he EPA is also under a mandatory duty to establish a TMDL when a State fails over a long period of time to submit a TMDL; this prolonged failure can amount to the constructive submission of an inadequate TMDL, thus triggering the EPA's duty to issue its own." 411 F.3d 1103, 1105 (9th Cir. 2005) (internal quotation marks omitted).

Our precedent accords with the treatment of constructive submission in other circuits. In *Scott v. City of Hammond*, the Seventh Circuit held that "if a state fails over a long period of time to submit proposed TMDL[s], this prolonged

failure may amount to the 'constructive submission' by that state of no TMDL[s]." 741 F.2d 992, 996 (7th Cir. 1984) (per curiam). The Tenth Circuit followed *Scott* in *Hayes v. Whitman* and agreed that though not triggered on the facts before it, a state's failure to submit a TMDL could trigger the EPA's nondiscretionary duty to develop and issue its own TMDL. 264 F.3d 1017, 1024 (10th Cir. 2001).

Taken together, our precedent and the case law of other circuits consistently holds that a constructive submission will be found where a state has "fail[ed] over a long period of time to submit a TMDL," *City of Arcadia*, 411 F.3d at 1105, and "clearly and unambiguously decided not to submit any TMDL[s]." *BayKeeper*, 297 F.3d at 883.

## II. Triggering Constructive Submission

The EPA urges us to read this precedent narrowly, reasoning that "at most, EPA's duty to establish a TMDL arises only when a State completely fails to submit any TMDLs for approval." In this case, the EPA argues, Washington and Oregon have submitted more than 1,200 TMDLs, and therefore cannot be found to have clearly and unambiguously decided not to submit any TMDLs. According to the EPA, only where a state has exhibited a wholesale failure to submit any TMDLs for the entire state regime should constructive submission be found under § 1313(d)(2). By contrast, where a state has abandoned a particular TMDL, no constructive submission of that TMDL should be found.

The EPA is certainly correct that the constructive submission doctrine was developed initially in the context of states' wholesale failures to make any progress in the development and issuance of TMDLs. In *BayKeeper*, for example, the plaintiffs argued that California had failed to

issue any TMDLs between 1980 and 1994, and these "failings under the CWA have triggered a duty on the part of the EPA to establish TMDLs *for the entire state*." 411 F.3d at 881 (emphasis added). We therefore were asked to conclude that California had clearly and unambiguously decided to abandon its entire state TMDL program, rather than any individual TMDL. We declined to do so, noting that California had more recently (1) "completed 46 TMDLs for waters on [its] lists," (2) "established a schedule for completing all TMDLs," and (3) "dedicated substantial resources to its TMDL program." *Id.* at 880. California clearly had not abandoned its state-wide TMDL program, and so the EPA's mandatory duty to develop its own TMDL regime for the state was not triggered.

But our holding in *BayKeeper* does not limit the application of the constructive submission doctrine to a wholesale failure by a state to submit any TMDLs. Such a limitation is not supported by either the language and purpose of the CWA or the logic of our case law.

First, we look to the text of § 1313(d)(2). The language of this subsection is clear: "each state shall submit to the Administrator" the applicable TMDL. Congress did not create a discretionary opportunity for states to submit a TMDL for applicable waters or waterways: it created a nondiscretionary obligation to submit each required TMDL. Were a state allowed to avoid submitting a required TMDL by simply failing to do so, it would defeat the clear objective of the CWA by a mere refusal to act.

An interpretation of § 1313 that provides states and the EPA with the opportunity to avoid their statutory obligations is incompatible with both the mechanics and purpose of the entire statute. Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of

the Nation's waters," and with the "goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a), (a)(1). That purpose would be dramatically undermined if we were to read into § 1313(d)(2) a loophole by which a state, and by extension the EPA, could avoid its statutory obligations by a mere refusal to act.

This interpretation is bolstered by the expedited timeline mandated elsewhere in the same subsection. The EPA must "approve or disapprove [a TMDL] not later than thirty days after the date of submission" by a state. § 1313(d)(2). And "[i]f the [EPA] disapproves such identification and load, [it] shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters . . . ." *Id.* An interpretation of § 1313(d)(2) that allows the EPA to indefinitely avoid compliance with the requirements of the statute would undermine the clear expediency that Congress mandated throughout the subsection and would be difficult to reconcile with the purpose of the statute.

Our previous treatment of the constructive submission doctrine reflects this interpretation of the CWA. Although the court in *BayKeeper* considered only the question of when a statewide failure to submit any TMDLs constitutes a constructive submission, nothing in that opinion limited the doctrine's application to statewide failures. Rather, it affirmed that § 1313 creates a statutory regime of nondiscretionary duties for both the states and the EPA. *BayKeeper*, 297 F.3d at 881–83. And when we next addressed constructive submission in *City of Arcadia*, we held that "[t]he EPA is also under a mandatory duty to establish a TMDL when a State fails over a long period of time to submit a TMDL." 411 F.3d at 1105 (citing

*BayKeeper*, 297 F.3d at 880–84). This language contemplates that a state could constructively submit a single, specific TMDL for a body of water or waterway.

This approach is also consistent with other circuits that have addressed this issue. The most thorough examination of this question is found in *Hayes v. Whitman*, where the Tenth Circuit concluded that "[t]he constructive-submission theory turns on whether the state has determined not to submit *a required TMDL for a given impaired waterbody.*" 264 F.3d at 1023 (emphasis added). The court went on to explain that constructive submission occurs "when the state's actions clearly and unambiguously express a decision to submit no TMDL for a particular impaired waterbody." *Id.* at 1024. Although the Tenth Circuit in *Hayes* declined to find such a clear and unambiguous expression on the facts before it, the court recognized the statute's provision for the constructive submission of a particular TMDL under a different set of facts. *Id.* at 1024.

To be clear, the constructive submission doctrine does not prevent a state from prioritizing the development and issuance of a particular TMDL. *See BayKeeper*, 297 F.3d at 885 ("To interpret [§ 1313(d)(1)(C)] as a requirement of simultaneous submission of the list of polluted waters with the TMDL to correct each polluted water would render meaningless the provision that the TMDLs are to be established in accordance with priority ranking of the listed polluted waters." (internal quotation marks removed)). The CWA itself requires states to "establish a priority ranking" of impaired waters and then develop and issue TMDLs "in accordance with the priority ranking." § 1313(d)(1)(C).

Reading the constructive submission doctrine in this way does not rob states of this ability to prioritize particular TMDLs. Rather, it recognizes a meaningful difference

between affording less priority to a particular TMDL and declining to develop and issue that TMDL at all. Where a state has failed to develop and issue a particular TMDL for a prolonged period of time, and has failed to develop a schedule and credible plan for producing that TMDL, it has no longer simply failed to prioritize this obligation. Instead, there has been a constructive submission of no TMDL, which triggers the EPA's mandatory duty to act.

### III. Unambiguous Statement of No TMDL by Washington and Oregon

Having clarified the scope of constructive submission, we next consider whether Washington and Oregon have clearly and unambiguously decided not to produce and issue a temperature TMDL for the Columbia and Snake Rivers, which in turn triggers nondiscretionary obligations for the EPA.

Since at least the late-1990s, both Washington and Oregon have recognized the need for temperature and gas TMDLs for the Columbia and Snake Rivers. In 2001, Washington and Oregon asked the EPA to produce the temperature TMDL on their behalf. The EPA agreed that it alone would do so, while Washington and Oregon focused on their overdue gas TMDL. The EPA subsequently acknowledged that it had agreed to develop and issue the temperature TMDL under the MOA. In 2003, pursuant to the MOA and the EPA's own Work Plan, the EPA released a draft TMDL and explained that a final version would be forthcoming after the public comment period. Then, nothing happened.

The EPA shelved its draft, and neither the EPA, Washington, nor Oregon took further steps to develop the temperature TMDL. Since the early 2000s, each state has

developed and issued more than 1,200 TMDLs, including other TMDLs for the Columbia and Snake Rivers. Both states have maintained priority lists with target dates of completion for outstanding TMDLs. Yet the Columbia and Snake Rivers temperature TMDL is conspicuously absent from the priority rankings. The states appear to believe that the EPA is the party responsible for the development and issuance of the TMDL. There is no credible plan to produce or issue this TMDL by the states. The states' continued inaction amounts to a clear "refusal to act" and a "prolonged failure" to produce the temperature TMDL. *BayKeeper*, 297 F.3d at 882, 887 (quoting *Scott*, 741 F.2d at 996–97). This refusal to act is further underscored by the nature of the MOA and the EPA's own Work Plan, which stipulate that the states do not intend to develop the temperature TMDL themselves, and instead understand that the EPA will do so.

Viewing these facts in their totality, we agree with the district court that "Washington and Oregon have clearly and unambiguously indicated that they will not produce a TMDL for these waterways," and that as a result, "the EPA has violated the CWA by failing to issue a TMDL for the Columbia and lower Snake Rivers." *Columbia Riverkeeper v. Pruitt*, 337 F. Supp. 3d 989, 998 (W.D. Wash. 2018).

## CONCLUSION

Because Washington and Oregon have conclusively refused to develop and issue a temperature TMDL for the Columbia and Snake Rivers, the EPA is obligated to act under § 1313(d)(2). This constructive submission of no TMDL triggers the EPA's duty to develop and issue its own TMDL within 30 days, and it has failed to do so. The time has come—the EPA must do so now.

**AFFIRMED.**